UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| MARTHA HATCH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:04-CV-122 |
| | ) | |
| AMERICAN ELECTRONIC | ) | |
| COMPONENTS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the court is Defendant, American Electronic Components', ("AEC's"), Motion for

Summary Judgment filed on February 25, 2005.  Plaintiff, Martha Hatch ("Hatch"), responded in

opposition on March 30, 2005 and, in addition, filed her Motion to Strike evidence submitted by

AEC to support its summary judgment motion.  Subsequently, along with its Reply to the summary

judgment motion, AEC filed its own Motion to Strike.  On April 22, 2005, Hatch filed her second

(the case's third) Motion to Strike portions of the reply to summary judgment.

For the following reasons, Defendant's Motion for Summary Judgment is DENIED in part

and GRANTED in part.  The Motions to Strike are DENIED in part and GRANTED in part.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if there are no disputed genuine issues of material

fact.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  When ruling on a motion for summary

judgment, a court "may not make credibility determinations, weigh the evidence, or decide which

inferences to draw from the facts; these are jobs for a factfinder."  *Id.*  The only task in ruling on a

motion for summary judgment is "to decide, based on the evidence of record, whether there is any

1

material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## **BACKGROUND**

### **Motions to Strike**

Before turning to a recitation of the facts underlying this case, it is necessary to first resolve the issues contained within three motions to strike filed by the parties in relation to materials filed by both sides in support of their respective summary judgment positions. Both sides have submitted affidavits from coworkers and former supervisors of Hatch indicating that they had contact with Hatch and observed certain behavior from Hatch. Not surprisingly, Hatch's submissions contain statements that the employees found Hatch pleasant to work with, she got along with others well, and never yelled or displayed her temper. *See generally,* Benien Affidavit, at ¶ 13-14; Elizabeth Dean Affidavit at ¶3. Likewise, Hatch has submitted numerous pages, mostly in her 28 page affidavit and attachments thereto, wherein she cites to others' opinions of her performance in an attempt to show that any performance problems claimed by AEC were fabricated.

As one would imagine, AEC's submissions contain statements from coworkers and others at AEC that Hatch was difficult, temperamental, rude, and generally disliked by employees at AEC.

2

*See generally,* Affidavit of Connie Malloy, at ¶4 , Affidavit of Bobby Dobbs at ¶5; Affidavit of

Vicki Stanley at ¶4.; Declaration  of Robin Bliss at ¶3; Declaration of Josephine Ulrey at ¶4-5.

These submissions, and the accompanying motions to strike them,  have made the court's

analysis of this case infinitely more complicated than it need be at this stage.  Moreover, the Seventh

Circuit has specifically cautioned litigants about loading the record with irrelevant facts in an

attempt to secure either an inference of discrimination or to dispel such a notion. *Gorence v. Eagle*

*Food Centers, Inc.* 242 F.3d 759, 763 (7th Cir. 2001) ("It is simply not true, we want to emphasize,

that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies

will add up to relevant evidence of discriminatory intent. They do not; zero plus zero is zero.").  The

court has reviewed the submissions and the motions to strike and shall DENY all the motions to

strike as MOOT since the court did not utilize the submissions in formulating this decision.

There are a few exceptions to this general ruling and to the extent the court has utilized some

of the evidence subject to a motion to strike, the court has addressed the issue of the motion to strike

in a footnote accompanying the reference in the factual section.

There is also an exception to the exception, however, and that is a belatedly filed affidavit

from Elizabeth Dean ("Dean"), a former employee of AEC prior to the sale of AEC to Riverside.

Hatch submits this evidence as an attempt to bolster her age discrimination claim by showing that

Lebanion had a pattern of terminating older employees who were performing satisfactorily.  Hatch

did not disclose this witness pursuant to Fed.R.Civ.P. 26 for various reasons which need not be

recited herein and, even if she had, Dean's affidavit would still be stricken.  Dean, who held the

position of supervisor in Quality Testing Laboratory, was laid off due to job elimination nearly a

year before Dana's sale of AEC to Riverside.  Dean never reported to Cerny, the final decision-

maker in this case and thus, her affidavit does not support the contention that Cerny discriminated on the basis of age.  As a result, the court STRIKES Dean's affidavit and any references in the filings to Dean's affidavit.

**Factual Recitation**

AEC is a designer and manufacturer of electrical and electronic components for automotive and industrial applications in Elkhart, Indiana.  AEC was a wholly owned subsidiary of Dana Corporation, Inc. ("Dana') until November 2002,  when it was sold by Dana to Riverside Partners, LLC ("Riverside").     Hatch worked as the human resources manager at Dana's Fort Wayne, Indiana facility from sometime in 1998 until mid-2000 when she interviewed and received employment at AEC.  Hatch was then employed as the human resources manager with AEC in both of its Elkhart, Indiana plants from October 2000 until her termination in August 2003.[1]

At the time she began working with AEC, Hatch, who is black,  reported to AEC's general manager, John Leech ("Leech").  In August 2001, Dan Lebanion ("Lebanion") transferred to AEC to assume the role of plant manager. Hatch was then directed to report to both Lebanion and Leech, with Lebanion responsible for the bulk of Hatch's duties including performance evaluations.  After Riverside bought AEC in November 2002, Leech remained under contract as the acting General Manager of AEC and  Lebanion became AEC's Vice-President of Operations.  Both Leech and Lebanion remained Hatch's supervisors during this time. (Leech Aff. at ¶¶7, 10).  In February 2003, Ron Cerny ("Cerny") became President of AEC and, as of March 2003, Leech was no longer involved in any capacity with AEC.

When Hatch first began at AEC under Leech's supervision, the human resources department

---

[1] Prior to working with AEC, Hatch had worked for Dana in various capacities since 1975.

was in a transitional phase due to the absence of a full time manager in the department.  (Leech Aff.
at ¶3).[2]  Even during this transitional phase, Leech stated that Hatch "took discussion and criticisms
about her department well even when she disagreed" and he "never found Martha to be belligerent."
(*Id.* at ¶5).  Likewise, he "found Martha to be very pleasant and very knowledgeable regarding union
matters."  (*Id.*).  He also noted that "Martha reacted professionally and appropriately" when Leech
instructed her "to be less stubborn about an issue."  (*Id.*).

Hatch has presented a lengthy factual history of her employment; but, the relevant period of
time for purposes of this motion begins in August 2001, when Lebanion transferred to AEC, and
continues through Cerny's tenure with AEC, for it is during this period that things seemed to go
downhill quickly for Hatch.

After he began at AEC, Lebanion became responsible for completing Hatch's annual
performance evaluations.  On January 16, 2003,  Lebanion evaluated Hatch for the year 2002 and
scored her based upon a rating system of 1 to 5 (with a "1" being the poorest mark) in various areas
including job knowledge, cooperation, quality of work, initiative, work output, reliability, judgment,
communication, and leadership.  Hatch received a score of "4" listed as "exceeding expectations"
in four categories, a score of "4.5" in job knowledge, and a score of "3" listed as "meets
expectations" in quality of work, cooperation, judgment, communication, and leadership.  Lebanion
further made typewritten comments as to each of the categories.   For instance,  under the

---

[2]For six months prior to  Hatch beginning work as the human resources manager, the position had
been open due to the prior manager quitting and according to Leech the department "lack[ed] direction."
(Leech Aff. at ¶3).  The remaining employees, Evelyne Belizaire ("Evelyne") and Earlie Rollins
("Earlie") were, according to Leech, "weak in their HR abilities."  In particular, Evelyne "had great
difficulty with thoroughness and understanding of her job duties" (Leech Aff. at ¶6).  The concern about
Evelyne's performance was so great that Leech requested Hatch to consider terminating Evelyne's
employment due to her performance deficiencies.  (*Id.*).

"communication" evaluation factor, Lebanion wrote that Hatch "generally communicates well" but she "[d]oes have issues at times with hourly employees where communication could be improved."

Likewise in the comments to the "judgment" evaluation factor, Lebanion wrote:

> Makes solid, fact-based decisions, is generally calm in most situations...Additionally...while she makes good decisions, [sic] has been getting frustrated in dealing with associates which has caused her to make some subjective decisions/comments/reactions.

Finally, in the comments as to the "cooperation" factor, Lebanion wrote:

> Martha generally works well with the staff and generally has a good attitude.  Good attitude towards her work and in general to all associates.  Can be stubborn at times towards other staff members when working on issues.  This has not changed since last year.  I still need to step into issues between her and other staff members to resolve issues that should be solved between them.  Also has had issues with hourly associates where she has heatedly argued with something an HR Manager needs to be above.

Thus, while Hatch received positive overall marks, it can be fairly said that Lebanion found some need for improvement from Hatch as early as January 2003.

In February 2003, Cerny came on-board with AEC and Leech remained at AEC during the transition phase of Cerny's employment.  Leech averred that he conferred with Cerny and Lebanion about his [Leech's] assessment of senior management employees, including Martha.  Leech stated that he explained to Cerny that he had concerns with the HR department[3] and that Hatch needed to become more proactive in making the department stronger.  Cerny and Lebanion asked Leech if he had documented any concerns with Hatch's department or Hatch specifically and Leech directed them to Hatch's personnel file.  Cerny and Lebanion further asked Leech for "advice" on how to deal with Hatch.  Leech responded by telling Cerny and Lebanion to give her clear directions and

_____

[3]Many of those concerns were with those working under Hatch and not necessarily with Hatch herself.  (Leech Aff. ¶6).

6

work with her.  Leech also informed them that Hatch documents everything and thus, they should do so as well.  In Leech's opinion "Ron [Cerny] had concerns with Martha's performance as the HR Manager as soon as he arrived."  (Leech Aff. at ¶11).

As part of his management style, Cerny kept private files on managers at AEC, including Hatch.  Cerny testified that he keeps a file on the managers so that "if there's anything that's particularly noteworthy, either favorable or not, [he'll] keep track of it."  (Cerny Dep. at 61).  As far as Hatch's file, Cerny indicated that her file contained mostly negative feedback because "it look[ed] like very early on it became apparent based upon the comments from the floor and from the other managers that there was a problem here.  And so I needed to understand that and I wanted to make sure I was documenting it."  (*Id*. at 100).  Cerny made entries in Hatch's file on March 28, 2003, May 1, 2003, May 7, 2003, July 25, 2003, and August 4, 2003.  Hatch avers that the entries were fabricated by Cerny and that meetings did not occur on these dates or the conversations recounted in the entries did not occur as written. (Hatch Aff. ¶57).

**Problems at the Lafayette Street Plant**

As part of her job, Hatch was required to visit the Lafayette Street plant at least once a week. The employees at the Lafayette Street plan "always gave Martha a hard time about everything" and had difficulty with management and with Hatch as the HR manager.  (Leech Aff. ¶16).  During Leech's tenure as Hatch's supervisor, Hatch had complained to Leech several times about the hostility she received at the Lafayette Street plant.

In December 2002, Hatch emailed both Lebanion and Leech and  indicated that employees at the Lafayette Plant were giving her a difficult time and that she believed "it is not a matter of attitude, it is a matter of race."  (Hatch Dep.  at 193).  Hatch further believed that she was not

receiving adequate support from other management officials when she was engaged in business at the Lafayette Plant.  According to Hatch, "there was always a problem with race [at the  Lafayette plant].  They didn't like it when I first came.  They didn't like me, and I had not been there more than a few days before they started attacking me."  (Hatch Dep. At 193-194).

From as early as September 2002 onward, Hatch complained about ongoing racially discriminatory conduct she became aware of from other employees during her visits to  the Lafayette Street plant.  (Hatch Dep. ¶174-175, 177-186).  Hatch complained to Lebanion that she had been told that two employees,  John Barlow ("Barlow"), a manager at the Lafayette plant, and Jim Dyer ("Dyer")"had been referring to black people as those people, those niggers are at it again or nigger Martha."  (*Id.*).[4]

On March 5, 2003, Hatch emailed Lebanion and informed them that members of her staff were being harassed by Barlow.   In addition to these complaints, on April 3, 2003, Hatch complained in writing to  Lebanion in a document titled "Charge of Discrimination against John Barlow."   In this document, Hatch detailed 23 instances related to Barlow that she had either experienced first-hand or had been told by others.  Hatch indicated, for instance, that Barlow would call her and want to argue, insinuates that the HR department is stupid, denies her information she requests, subjects her to "constant badgering,"and "constant intimidation" of her, Evelyne and Earlie, two black employees working in her department.

This document authored by Hatch, spurred a meeting with Lebanion on April 7, 2003.

_____

[4]AEC has moved to strike these comments as double hearsay since in her deposition, Hatch indicated that another employee heard that Barlow was making the above references from another employee.  The relevant fact here is not whether Barlow, in fact, made the statements but that Hatch reported the alleged statements to Lebanion.  Accordingly, the motion to strike this testimony is DENIED.

During this meeting, Hatch recounted her prior complaints concerning Barlow.  But, according to Hatch, Lebanion was hostile to her and told her that she had issues with everyone on staff and mistreated employees.  Hatch believes that this hostility was, in part, because Barlow and Lebanion were friends.  (Hatch Aff. ¶43).

**Cerny's Arrival and Instances of Alleged Performance Deficiencies**

After Cerny's arrival at AEC, he held a meeting on March 6, 2003 wherein Cerny announced his intention to hire a Vice President of Human Resources and a Vice President of Quality. According to Hatch, at that time the human resources and quality departments were the only departments with AEC in which African-American employees held the head management positions.[5] (Hatch Aff. ¶34). Hatch inquired about the VP of Human Resources position but, as she contends, was told that Cerny would not discuss the position with her.  Cerny eventually hired Ken Leeth ("Leeth"), a white male, as the Vice President of Quality.  It does not appear from the record that Cerny hired anyone as a Vice President of Human Resources.

Hatch contends that shortly after Cerny's arrival she was falsely accused of various performance deficiencies including: (1) an incident on March 31, 2003, wherein Cerny claimed that Hatch failed to address the problem of an employee who was having difficulty with health insurance; (2) an incident involving Janet Hammons wherein Cerny claimed that Hatch did not resolve an issue concerning the payment of short term disability benefits to Hammons; (3)  an incident in May 2003 when Cerny was advised that Hatch allegedly ran a newspaper advertisement seeking to hire new

---

[5]In a footnote in its reply brief, AEC notes that there are presently African Americans who report directly to Lebanion and who have been promoted within the company.  Further, Cerny indicates that at the time of Hatch's termination, Patricia Robinson, a black female was a supervisor who reported to Barlow, a manager.  (Cerny Aff. at ¶4).  While Robinson may have been a supervisor at the time of these events, AEC does not dispute that at the time of the events related to Hatch's claims, George Thompson, a black male, and Hatch were the only two black managers at AEC.

production employees without incorporating changes made by Barlow as she had been instructed; (4) an incident wherein Cerny instructed Hatch to contact AEC's health insurance carrier to get the waiting period waived so that a new vice-president could be immediately enrolled but Hatch allegedly did not follow through and enroll the vice president.   In addition to the above specific instances of deficiencies, Hatch alleges that Cerny wrongfully accused her of confusing AEC's obligations to file an EEO1 form and an affirmative action plan and jumping to conclusions on HIPAA requirements.[6]

## Mid-Year Performance Evaluation

On June 23, 2003, Lebanion met with Hatch to review her mid-year performance. Prior to Lebanion becoming her supervisor, Hatch had never been given a mid-year review nor did managers routinely receive mid-year reviews.  Lebanion scored Hatch poorly in several.  Hatch received a "1" in cooperation, a "2" for quality of work, a "2" for reliability, a "1" in judgment, a "1" in communication, and a "1" in leadership.  After reviewing the scores with Hatch and detailing the rationale for the score, Lebanion notified Hatch that she would receive more frequent reviews (every 60 days) and that if her performance did not improve, she would be terminated.  Lebanion further told Hatch that she needed to formulate a performance improvement plan by July 24, 2003 to address the concerns raised in the evaluation.   According to Hatch, until she was required to

---

[6]AEC has submitted affidavits from union stewards, supervisors, and others, outlining additional alleged performance deficiencies, all of which Hatch understandably felt it necessary to respond to in great detail.  The problem with AEC's strategy here is that  many of the facts set forth in the affidavit testimony are from employees who claim to have had run-ins with Hatch but the events were never reported (or at least there is no evidence that they were) to the decisionmakers in this case.  Thus, it appears that the point of the affidavits is merely to discredit the plaintiff.

formulate a performance improvement plan, no other employee was required to do so.[7]  Moreover,

Hatch indicated that prior to the June 23 evaluation meeting, she had never been told about any

problems with her interaction with employees nor were any complaints from employees brought to

her attention.

On June 24, 2003, Hatch drafted and emailed a written rebuttal to Lebanion's performance

evaluation.  In that rebuttal, Hatch requested specific instances of poor conduct on her part so that

she could address the incidents and improve her performance.[8]  On June 26, 2003, Lebanion emailed

Hatch a follow up to her performance evaluation which outlined areas Hatch needed to address in

her improvement plan.   The areas outlined in the follow-up included all of the areas in the

performance evaluation for which Hatch received a poor score and indicated, for instance, that in

the area of quality of work, "the plan must include steps to eliminate errors from the Human

Resources Department."  (Docket #26, p. 2 of 21).   Although the email receipt indicates that

Lebanion sent the email on June 26, 2003, there is some dispute as to when Hatch received the

email.  Hatch testified that she did not receive the follow-up email with the summary of what was

to be included in her performance action plan until July 22 – just two days before her performance

improvement plan was due.[9]

---

[7]While Hatch has submitted pages of studious notes she took regarding all the meetings she had
with Lebanion and later, meetings with Cerny, the court has not recounted the events related in the notes
in scrupulous detail.  It should be noted that Hatch's notes are very detailed and contain much information
which may become relevant at a trial in this case but for purposes of the present motions may be
summarized in a manner favorable to Hatch.

[8]  Although Hatch's letter is dated June 24, 2003, there is some dispute in the record as to when it
was emailed and when it was received by Lebanion.  A document dated July 23, 2003 from Lebanion
indicates that although Hatch's email receipt was dated June 26, 2003, Lebanion did not receive it until
July 22, 2003

[9]Strangely enough, however, on July 21, 2003, Hatch responded to Lebanion's follow up email
that included the follow-up summary, writing,  "[p]erhaps we should have a meeting because I don't

While this performance evaluation process was ongoing, Cerny learned that Hatch had, he believed, wrongfully transferred certain employees to AEC's medical carrier.  On July 16, 2003, Cerny called Hatch to his office and discussed this issue with her.  On the same day, Hatch delivered a memo to Cerny wherein she denied that she did anything incorrect or that she failed to follow the appropriate chain of command in making the transfer.  Rather, Hatch asserted that she had consulted with Leech and others and that the transfer was, in fact, authorized.   At the conclusion of the memo, Hatch wrote:

> I am starting to question whether there is a concerted effort to find fault with my work so that you will be able to replace me...[s]ince you have started with the company, I have regularly been assailed with accusations and I have had to prove to you and Dan Lebanion they are not true.  Yet they continue.

(Docket #26, Attachment 2, pp. 11-12).

On July 23, 2003, Lebanion and Hatch met again to discuss Hatch's performance improvement plan.  Rather than supply a formal action plan as Lebanion had envisioned, Hatch questioned in writing  what specific instances of behavior she should be discussing in the improvement plan.  For instance, under the heading "initiative" Hatch wrote: "Please clarify what you mean by steps to improve AEC as an organization."  Similarly, with regard to reliability, Hatch wrote "What are the issues and please provide in writing so that I can address and put together a plan."  Lebanion told Hatch that this submission was not an acceptable response to his request for a performance improvement plan and  that she must provide the requested plan by August 4, 2003.  Lebanion further indicated that it was her job to develop the action plan, not his.

Two days later, on July 25, 2003, Cerny responded to the comments made by Hatch in her

---

understand some of these things you have outlined."

email of July 23.  Cerny's response sets forth his rationale for his position as to Hatch's performance and indicates that he is "deeply troubled" by the tone and approach of her letter, especially Hatch's accusation that he was part of a concerted effort to discredit her.

On July 28, 2003, Hatch submitted another attempt at a performance improvement plan wherein she addressed matters discussed with Lebanion at the July 23, 2003 meeting.  There is some dispute in the record as to whether another meeting between  Lebanion and Hatch occurred on August 5, 2003.  Notwithstanding this dispute, Lebanion testified that on August 6, 2005, he emailed Cerny with a recommendation that AEC terminate Hatch's employment.  On August 7, 2003, Lebanion called Hatch to set up a meeting with her regarding the action plan that she had assembled.  When Hatch arrived at the meeting Cerny was present along with Lebanion.  Cerny informed Hatch that he saw no effort to improve in her action plan and that she was not exhibiting a changed attitude.  Hatch took notes of the meeting and her notes reflect that  Cerny specifically asked Hatch if she wanted to continue her employment at AEC or whether she would like to leave.  Hatch indicated that she wanted to continue working and Cerny instructed her that she had until August 11, 2003 to submit an acceptable action plan or other action with regard to her employment would be taken.  Cerny further advised that he wanted a verbal explanation from  Hatch on August 17, 2003[10] concerning how Hatch planned to change her performance and her behavior so that he could genuinely see that she planned to implement change.

On August 15, 2003, AEC received a copy of Hatch's first EEOC charge alleging that AEC was discriminating against her on the basis of her race, age, and sex.

---

[10]Cerny chose August 17 because Hatch was scheduled to be on vacation from August 8 until August 17, 2003.

On August 18, 2003, Hatch met again with Cerny to verbally discuss an improvement plan. According to Hatch, Cerny set forth a number of complaints about Hatch's performance and, Hatch contends, the meeting was extremely accusatory and confrontational. During this meeting, Hatch, as she had done in all prior meetings with Lebanion, denied all the accusations made by Cerny as to deficiencies in her performance.

On August 22, 2003, Cerny and Lebanion met once again with Hatch. Cerny informed Hatch she was terminated and asked her to read and sign a termination notice and a release of her previously filed discrimination claim. Hatch refused to sign the letter and asked Cerny if he had received her EEOC charge of discrimination. Cerny indicated that he had, told her "I'm really disappointed in you," and concluded the meeting.

There is some question as to who actually "replaced" Hatch. Initially at least, AEC hired a 53 year-old black male, Joseph Dickens to "fill[] in as our acting director for three or four months on a part-time basis." (Cerny Dep. P. 28). According to Dickens, although he had agreed only to an interim position, Cerny offered him the HR Manager position permanently. (Dickens Aff. ¶3-4). Dickens declined because he and Cerny agreed that Dickens was overqualified for that position in the longterm. (Dickens Aff. ¶3). Thereafter, Cerny hired Jessica Shetterly, a thirty-four year old white female to replace Hatch.

## DISCUSSION

Hatch filed suit alleging violations of sex and race discrimination as well as retaliation for her complaints of discrimination pursuant to Title VII of the Civil Rights Act ("Title VII"). She also asserts age discrimination pursuant to the Age Discrimination in Employment Act ("ADEA"). AEC has moved for summary judgment on all claims asserting that Hatch has not demonstrated a

genuine issue of material fact as to any of her discrimination theories.

## Title VII and ADEA Claims

To survive the motion for summary judgment, Hatch need only raise an inference of discrimination. *Fuka v. Thomson Consumer Elec.,* 82 F.3d 1397, 1402 (7th Cir.1996). With respect to the Title VII and ADEA claims, she may do this by various methods recognized in this circuit. Under the direct method of proof, there are two types of permissible evidence. First, there is direct evidence, or evidence that, if believed by the trier of fact, would prove the fact in question "without reliance on inference or presumption." *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir.2003) (internal quotation omitted). Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* (internal quotation omitted). Hatch does not purport to have such evidence and thus, the court moves on to the second type of permissible evidence which relies more on circumstantial evidence and allows a plaintiff to prevail by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Rhodes v. Illinois Dept. of Transp.,* 359 F.3d 498, 504 (7th Cir.2004) (citing *Troupe v. May Dep't Store Co .,* 20 F.3d 734, 737 (7th Cir.1994)).

Finally, there is a third method, the oft-recited *McDonnell-Douglas* standard, which AEC relies on almost exclusively in formulating its defense.  Under that method to establish a prima facie case under either Title VII or the ADEA, Hatch must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations;  (3) AEC took an adverse employment action against her and (4)  that AEC treated similarly-situated employees outside the protected class more favorably, or, in the age discrimination context, that she was replaced by a younger worker. *Stalter v. Wal-Mart Stores, Inc.,* 195 F.3d 285, 288 (7th Cir.1999)(Title VII); *Robin*

15

*v. Espo Engineering Corp.,* 200 F.3d 1081, 1090 (7th Cir.2000)(ADEA); *Olson v. Northern FS, Inc*. 387 F.3d 632, 635 -636 (7th Cir. 2004).

If Hatch meets the above  burden, AEC must articulate a legitimate, nondiscriminatory reason for its actions. *Little,* 369 F.3d at 1011. If AEC were able to point to such a reason, the burden remains with Hatch to show that the reason put forth was not a true reason, but a pretext--"a dishonest explanation, a lie rather than an oddity or an error." *Peters,* 307 F.3d at 545 (quoting *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 685 (7th Cir.2000)).

In its summary judgment motion, AEC argues that Hatch has neither of the types of direct evidence of discrimination set forth above and, with respect to the *McDonnell Douglas* approach, AEC challenges the second and fourth prongs of the burden-shifting analysis, i.e.,  whether Hatch was meeting her employer's legitimate expectations at the time of her termination and whether similarly situated others were treated more favorably (or in the case of age, whether Hatch was replaced by a substantially younger employee).  Hatch, in turn, contends that the Court should analyze her claim under the *Troupe* formulation and contends that there exists a "mosaic of evidence"  sufficient to allow a jury to infer intentional discrimination by Cerny and Lebanion.

Beginning first with Hatch's contention that her claim is appropriately analyzed under *Troupe,* the Seventh Circuit has clarified that the most common type of circumstantial evidence of intentional discrimination is "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736.  Hatch offers no evidence which reasonably could be characterized as suggesting racial, gender or age animus other than the fact that the events that transpired happened to an older black female.  Further,

she has produced no evidence of ambiguous statements, or behavior toward or comments directed at other African-American employees by either Lebanion or Cerny. In fact, AEC has produced an affidavit from George Thompson, the other black manager at AEC during this time, who claims that he has not experienced any instances of racial animosity or discrimination from either Lebanion or Cerny. In light of this record, Hatch must rely on "other bits and pieces" which she claims raises an inference of discriminatory intent.

Hatch notes, for instance, that in January 2003 when Lebanion gave her performance evaluation, she was meeting or exceeding AEC's expectations in every performance category. It is suspicious, Hatch argues, that once Cerny came on-board he immediately contemplated hiring Vice Presidents in the only two departments headed by black managers. And, when she inquired about the position, Cerny refused altogether to discuss it with her.

Likewise Hatch observes that once she documented, in writing, alleged instances of discrimination by Barlow to Lebanion, Lebanion and Cerny began finding deficiencies in her performance. Add to this, the fact that Hatch then received "out of the blue" a mid-year performance evaluation wherein she was rated poorly and was subject to a performance improvement plan process that had never been used at AEC before, and Hatch argues, there is sufficient evidence to suggest that Cerny and Lebanion were acting in concert to discredit her on the basis of some protected characteristic.

Having reviewed the evidence, the court agrees that Hatch has raised an inference that something was amiss. The hurdle Hatch faces, however, is that she has failed, under *Troupe,* to demonstrate that the decisionmakers were motivated by Hatch's race, gender, or age. Indeed, Troupe requires the circumstantial evidence to "point directly to a discriminatory reason for the

17

employer's action." *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir.2003).  There is simply no evidence in the record that Cerny and/or Lebanion had a racial (or age or gender-based) motivation for taking action against Hatch rather than some other motive. There is no record of racially derogatory remarks from them, no record of treating white male employees more favorably than black female employees, and no record of ambiguous statements which by themselves or in collaboration would support a conclusion that race, age or gender was the "real reason" for their action.  Further, the only evidence that even remotely supports an age or gender animus is that one of the two replacements was a black male and the other was a substantially younger white female. This is simply not enough to get by under *Troupe.*

For many of the same reasons, Hatch's discrimination claims fail under the McDonnell-Douglas formulation as well.  AEC argues that because Hatch was not performing satisfactorily at the time of her termination, she cannot meet the second prima facie case element.  On that point, the court is faced with the classic situation wherein an employer's alleged non-discriminatory reason for terminating the plaintiff is that the employee's performance did not meet the employer's expectations.  In cases where this occurs, the legitimate expectations prong of the prima facie case often merges with the related issue of pretext.  *Roberts v. Separators, Inc.,* 172 F.3d 448, 451 (7th Cir.1999) (analysis of employer's legitimate expectations often "dovetails" with that of pretext).

As is by now evident from the factual record, there are substantial factual disputes between Hatch, Cerny and Lebanion concerning Hatch's performance.  Hatch has submitted pages of evidence suggesting that Cerny and Lebanion fabricated performance issues where none existed. Hatch has also submitted statements from Leech and others indicating that her job performance appeared satisfactory to them.  As a general matter, the statements of co-workers, indicating that a

18

plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated. *See, e.g., Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460 (7th Cir.1994) ("Our cases ... give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance."). *See also Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1125 (7th Cir.1994); *Kephart v. Inst. of Gas Tech.,* 630 F.2d 1217, 1218-19, 1223 (7th Cir.1980). However, Hatch has done more here. She has produced objective evidence that contradicts the alleged performance deficiencies cited by Cerny and Lebanion.

But, Hatch must show more than simply a wrong decision or even a fabricated one. Title VII is not violated by a fabricated decision; it is violated by a discriminatory decision. Thus, Hatch must show that either her race, sex or age was *the determining factor* in her discharge, or that but for her race, sex, or age, she would not have been discharged. *Dale v. Chi. Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986). To meet this burden, Hatch must produce "significantly probative admissible evidence" from which the trier of fact could infer that the employer's reason was false *and* that the actual reason was discriminatory. *King v. Preferred Technical Group,* 166 F.3d 887, 892-93 (7th Cir.1999); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). As the court indicated above, Hatch simply has not produced any "significantly probative evidence" from which a jury could conclude that the actual reason for her termination was race, gender, or age. *See U.S. Postal Service Bd. of Govs. v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("The 'factual inquiry' in a Title VII case is '[whether] the defendant intentionally discriminated against the plaintiff.'). Accordingly, the court GRANTS AEC's motion for summary judgment on Hatch's claims of age, gender, and race discrimination.

19

**Retaliation**

The court is left then with Hatch's retaliation claim, a claim that is amply supported in the record. An employer may not retaliate against an employee who has complained about discrimination or other employment practices that violate Title VII. 42 U.S.C. § 2000e-3(a). A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method. *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903 -904 (7th Cir. 2005); *Sitar v. Indiana Dep't of Transp.,* 344 F.3d 720, 728 (7th Cir.2003). The direct method requires the plaintiff to show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by the employer; and (3) a causal connection between the two. *Id.* Under the alternative indirect method, the plaintiff must establish a prima facie case of retaliation by showing that: (1) she engaged in a statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity *Stone v. City of Indianapolis Public Util. Div.,* 281 F.3d 640, 644 (7th Cir.2002); see also *Racicot v. Wal-Mart Stores, Inc.,* ___ F.3d ___, 2005 WL 1560332, *3 (7th Cir. July 5, 2005).

Before turning to the evidence, the court must address a threshold issue raised by AEC, that is that Hatch may not assert a retaliation claim in this lawsuit because she failed to check retaliation in her EEOC charge of discrimination. AEC is correct that a Title VII plaintiff may bring only those claims that were included in her EEOC charge, or that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 481 (7th Cir.1996) (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th.Cir.1976)); *see also Ajayi v. Aramark Bus. Servs., Inc.,* 336 F.3d 520 (7th.Cir.2003). The rule

is meant both to give the EEOC and employer an opportunity to settle the dispute and to give the employer fair notice of the conduct about which the employee is complaining. *See Haugerud v. Amery School Dist.,* 259 F.3d 678, 689 (7th Cir.2001).

Here, however, AEC's argument misses the mark.  At the time Hatch filed her charge of discrimination, she had, in fact complained of race discrimination to Lebanion, but had not yet suffered an adverse employment action, i.e. termination,  so as to put her on notice of what she now believes to be unlawful retaliation.   Further, as a general proposition, it is "unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge." *Gupta v. East Texas State University*, 654 F.2d 411, 414 (5th Cir.1981);[11] *McKenzie v. Illinois Dep't. of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996); *Steffen v. Meridian Life Ins. Co.,* 859 F.2d 534 (7th Cir.1988) (noting that in cases where the alleged retaliation arose after the charge of discrimination had been filed, only a single filing was necessary to comply with the intent of Title VII; a double filing "would serve no purpose except to create additional procedural technicalities.").  Thus, in this case, where Hatch contends that her termination was the result of her earlier claims of race discrimination by Barlow, she is not required to file a second charge to pursue a retaliation claim.  *See Id.*

---

[11]The reasoning in *Gupta* was as follows:

It is the nature of retaliation claims that they arise after the filing of the EEOC charge. Requiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case--a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII. We are reluctant to erect a needless procedural barrier to the private claimant under Title VII, especially since the EEOC relies largely upon the private lawsuit to obtain the goals of Title VII. Intertwined with this practical reason for our holding is a strong policy justification. Eliminating this needless procedural barrier will deter employers from attempting to discourage employees from exercising their rights under Title VII.

Looking now at the substance of Hatch's claim, the court has little difficulty concluding that Hatch has demonstrated sufficient evidence under the direct methodology to overcome summary judgment.   There can be no question that when Hatch complained about perceived race discrimination, she was engaging in activity protected by Title VII. Indeed, "only a groundless claim 'resting on facts that no reasonable person possibly could have construed as a case of discrimination' could not constitute a statutorily protected activity." *Firestine v. Parkview Health System, Inc.* 388 F.3d 229, 234 (7th Cir. 2004).  Likewise, there can be no dispute that her termination qualifies as an adverse employment action.   *See Haywood v. Lucent Technologies, Inc.* 323 F.3d 524, 531 -532 (7th Cir. 2003).  This leaves causation and, a review of the evidence in Hatch's favor demonstrates that she has raised a genuine issue of fact on this element sufficient to let a jury decide the matter.

A favorable view of the evidence to Hatch's claim shows that although she had complained about Barlow in the past, in April 2003 she became more vocal about her complaints of race discrimination by Barlow – so much so that she emailed Lebanion a document titled "Charge of Discrimination against John Barlow."   After receiving Hatch's email, Lebanion's response was hostile and, there is no evidence that Lebanion took the complaints to heart or investigated Hatch's complaints about Barlow.   Thereafter, Lebanion, with the aid of Cerny, began documenting performance deficiences which, in turn led, a mere two months later, to an unprecedented mid-year performance review wherein Lebanion scored her substantially lower than he had six months before and required her to file a performance improvement plan that no other employee had ever been asked to file.

22

It is important to distinguish this case from the typical retaliation case where a plaintiff relies on temporal proximity alone, which, is not necessarily sufficient to establish a prima facie case in the retaliation context. *Hudson v. Wal-Mart Stores, Inc.*, — F.3d ___, 2005 WL 1433879 (7th Cir. June 21, 2005) ("timing, 'standing alone, does not create a genuine issue as to casual connection.'") (quoting *Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1034 (7th Cir.1999). Here, Hatch has temporal proximity on her side along with "[o]ther evidence of retaliation, whether significant or modest, [that] could make the timing evidence stronger and provide a plaintiff with a basis to argue that a reasonable jury could find in h[er] favor." *Id.*

Hatch's evidence suggests that after she complained of race discrimination she was subjected to processes that no other employee at AEC had been subject to during her long tenure as the HR manager there. In addition, Hatch contends that after she complained to Lebanion in April 2003, there was a sudden change in his attitude toward her. A sudden change in attitude by management after a plaintiff reports discrimination may raise an inference of retaliation if the plaintiff can establish that the only intervening event was her discrimination report. See *Marshall v. American Hosp. Ass'n,* 157 F.3d 520, 526 (C.A.7 (Ill.),1998) ("[a] sudden change in attitude upon disclosure that the plaintiff is member of a protected class may raise an inference of discrimination if the plaintiff can establish that the only intervening event was the disclosure." ); *Leffel v. Valley Financial Services*, 113 F.3d 787, 794 (7th Cir.1997), *cert. denied*, 522 U.S. 968, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997) ("A bank officer who is praised and given wide discretion in the performance of her duties one day but is confronted with a laundry list of manufactured criticisms and confining performance standards the next may be able to raise an inference that discrimination is afoot by establishing that the only intervening event was the disclosure that she is disabled.").

A sudden change in attitude by management is precisely what Hatch claims occurred here. The objective evidence indicates that with only a few problems, Hatch performed successfully throughout the year 2002 and before. Indeed, this fact is corroborated by Leech's affidavit even though Leech knew of a few instances of poor judgment or poor reaction on Hatch's end of things. Likewise, the fact is confirmed by Lebanion's own performance evaluation and the comments therein. This said, the question arises as to what intervening events occurred that could merit the poor evaluation she received in June 2003. As to this question, the parties have each presented a plausible theory. For AEC's part, it contends that her performance simply deteriorated during that time and her difficulty interacting with employees came to Cerny's and Lebanion's attention. However, there are other plausible theories. The first is that Cerny game aboard gunning for Hatch based on some sort of discriminatory animus. Another theory (and the more plausible one reading the facts favorably to Hatch) is that once Hatch became more vocal about her complaints of race discrimination by Barlow, Lebanion (and later Cerny) decided to find fault with Hatch so as to justify her termination and rid AEC of the trouble Hatch was making for them. Because the record supports both inferences, the Court concludes that Hatch has produced enough admissible evidence to create questions of material fact as to whether she was a victim of retaliation. For these reason's, AEC's Motion for Summary Judgment as to Hatch's claim of retaliation is DENIED.

## Conclusion

Based on the foregoing, Plaintiff's Motion to Strike (docket #25) and Plaintiff's Second Motion to Strike (docket #35) are DENIED as MOOT. Defendant's Motion to Strike the Affidavit of Elizabeth Dean (Docket #31) is GRANTED. AEC's Motion for Summary Judgment is GRANTED as to Hatch's claims of race, age, and sex discrimination. AEC's Motion is DENIED

as to Hatch's claim of retaliation.

Entered: This 25th day of July 2005.

s/ William C. Lee

United States District Court

Northern District of Indiana